# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| Katherine Sundgren,<br><br>Plaintiff,<br><br>vs.<br><br>Standard Insurance Company,<br><br>Defendant. | Case No.: _____<br><br><br>**PLAINTIFF'S COMPLAINT** |

Plaintiff, through her undersigned attorneys, states and alleges as follows:

## PARTIES

1.    Plaintiff Katherine Sundgren, ("Plaintiff") lives in the City of Coon Rapids, Minnesota. At all relevant times, Plaintiff was employed by Cargill, Inc. ("Cargill").  As a result of that employment, Plaintiff participated in the Long-Term Disability Plan ("LTD Plan") sponsored by Cargill and insured by Defendant Standard Insurance Company ("Standard").

2.    The LTD policy (hereafter "the Policy") was issued by Standard on 1/1/16 and bears policy number 647267-E. The Policy remained in effect as of the date of Plaintiff's disability.

3.      Standard is an insurer and administrator of disability insurance plans.  Standard is domiciled in the State of Oregon.

4.      At all times pertinent to this matter, Standard was licensed to sell insurance and do business in Minnesota.

## GOVERNING LAW, JURISDICTION, AND VENUE

5.      This Complaint arises under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §1001 *et seq*. ("ERISA"), and the principles of federal common law developed thereunder.

6.      The Court has jurisdiction over this Complaint pursuant to the jurisdictional provision of ERISA, 29 U.S.C. §1132(e)(1), and federal question jurisdiction under 28 U.S.C. §1331.

7.      Venue is proper in this district pursuant to 29 U.S.C. §1132(e)(2).

## POLICY LANGUAGE

8.      The Policy defines disability under two different standards, depending on the time period that applies.

9.      Plaintiff is covered under Class 1 of the LTD Plan. Therefore, the "Own Occupation Period" of disability applicable to Plaintiff is the first 24 months for which LTD benefits would have been payable. The "Any Occupation Period" for Plaintiff would have been from the end of the "Own Occupation Period" to the end of the Maximum Benefit Period.

10.   The Policy defines "Own Occupation Disability" as:

1.  *You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and*

2.  *You suffer a loss of at least 20% in your Indexed Predisability Earnings.*

The Policy also provides: *You may work in another occupation while you meet the Own Occupation Definition of Disability. However, you will no longer be Disabled when your Work Earnings from another occupation meet or exceed 80% of your Indexed Predisability Earnings.*

11.   The Policy defines "Any Occupation Disability" as:

*You are Disabled for all occupations if, as a result of Physical Disease, Injury, Pregnancy, or Mental Disorder, you are unable to perform with reasonable continuity the Material Duties of Any Occupation.*

*Any Occupation means any occupation or employment which you are able to perform, whether due to education, training, or experience, which is available at one or more locations in the national economy and in which you can be expected to earn at least 66.67% of your Indexed Predisability Earnings within twelve months following your return to work, regardless of whether you are working in that or any other occupation.*

*Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or omitted. In no event will we consider working an average of more than 40 hours per week to be a Material Duty.*

12.     The Policy provided that Plaintiff would be entitled to 60% of her indexed monthly earnings of $5,200. As a result, her gross LTD benefit would have been $3,150 per month.

## FACTUAL ALLEGATIONS

### *Plaintiff's Pre-Disability Medical Issues*

13.     Plaintiff was hired at Cargill in 2010. The last position she had was as a full-time administrative assistant supervisor at Cargill's research and development agricultural facility in Elk River, Minnesota. Plaintiff provided administrative support and gave tours and presentations about the farm and research facility.

14.     Plaintiff was diagnosed with major depression and general anxiety disorder in May 2014. Plaintiff managed her mental illnesses with the medications venlafaxine and clonazepam.

15.     Over the period 2014-2017, Plaintiff developed several unexplained symptoms and diagnoses including myofascial pain, migraines, an ulcer, temporomandibular joint disorder, difficulty falling and staying asleep, and attention deficit disorder. An autoimmune disorder was suspected.

16.     Plaintiff saw rheumatologist Paul Sufka, MD, on 1/22/18. Dr. Sufka observed, "*[Plaintiff] has had positive ANA, but no specific autoantibodies on ANA 12, scleroderma, or myositis panels. She has had*

4

*Raynaud's with abnormal nailfold capillary exam, occasional oral ulcers, and fatigue. She recently had developed a rash on her left cheek which had quickly worsened with significant swelling and formation of ulceration. Over time this was thought to be discoid lupus...She has had recurrence of the ulceration on her left cheek. She has also had swelling, pain, stiffness of her hands, also occasionally affecting her feet and knees...and shows a picture of a recent nasal ulceration.*" Dr. Sufka was able to confirm synovitis throughout the joints in her hands and wrists. Dr. Sufka prescribed azathioprine. Dr. Sufka opined that Plaintiff's condition was most consistent with systemic lupus erythematosus ("lupus").

17.     Plaintiff returned to Dr. Sufka's office on 3/26/18, and reported she was unable to tolerate azathioprine. Dr. Sufka observed a small ulceration along her anterior right nare (nostril). Plaintiff reported ongoing swelling in her hands/wrists, soreness in her neck, morning stiffness, and fatigue. The swelling was confirmed upon examination. Dr. Sufka prescribed mycophenolate.

18.     Plaintiff's condition deteriorated when she was forced to obtain an Order for Protection concerning her ex-spouse in April 2018. Plaintiff requested that Cargill provide on-site security at the Elk River farm where she worked.  Because Cargill was unable to do so, it placed Plaintiff on leave.

This leave transitioned to a medical leave on 4/19/18 as Plaintiff's condition worsened.

*Application for and Approval of STD Benefits*

19.　　Plaintiff applied for and was awarded benefits under the Cargill Short-Term Disability plan.

20.　　Plaintiff began treating with Leigh Hagglund, DNP, APRN, CNP for her medication management on 5/3/18. Plaintiff expressed how her anxiety and depression had been exacerbated by a recent accidental interaction with her ex-spouse. Plaintiff admitted having obsessive thinking, fatigue, low mood, and severe anxiety. Ms. Hagglund diagnosed major depressive disorder, recurrent, moderate, generalized anxiety disorder, and post-traumatic stress disorder ("PTSD").  Ms. Hagglund prescribed venlafaxine and clonazepam and recommended working with a counselor.

21.　　Plaintiff began psychotherapy with Angela Nelson, PsyD, LP, on 5/3/18. Dr. Nelson diagnosed panic disorder, major depression, moderate recurrent, and PTSD. Dr. Nelson recommended twice weekly therapy. Plaintiff saw Dr. Nelson 30 times between 5/3/18-11/20/18 and continued to treat with Dr. Nelson thereafter.

22.     When Plaintiff returned to see Ms. Hagglund on 5/15/18, she reported sleeping 20 hours per day with nightmares that woke her up. Plaintiff's anxiety was high, but she expressed interest in returning to work.

23.     Plaintiff returned to Ms. Hagglund on 6/4/18. Ms. Haggland opined, "*Remains anxious and easily distracted. Excess worry about returning to work...relying on clonazepam.*"

24.     At a follow up visit on 6/25/18, Ms. Haggland opined, "*[Patient is] Highly anxious and emotionally dysregulated...Major Depressive Disorder improved but easily tears [up] when anxiety is heightened.*"

25.     Plaintiff returned to Dr. Sufka on 7/8/18. Plaintiff had been using topical ointment and prednisone for a flaring 3-4 cm discoid lesion on her face. Plaintiff also reported that she had been hospitalized 7/1/18-7/5/18 for a perforated duodenal ulcer, requiring open abdominal surgery and repair. Again, Dr. Sufka observed bilateral synovitis in Plaintiff's hand and wrist joints. Due to the abdominal surgery, Plaintiff could not take the medications mycophenolate or meloxicam previously prescribed by Dr. Sufka. Dr. Sufka advised Plaintiff to remain off mycophenolate, prednisone, and NSAIDs while healing. He also prescribed clobetasol ointment for the face lesion and recommended a biopsy.

26.   The biopsy was performed by dermatologist Lydia Sahara, MD, on 7/10/18. Dr. Sahara opined that the lesion was atypical for lupus and that the biopsy showed very intense inflammation under the skin and scarring. Dr. Sahara prescribed the antibiotic Bactrim for ten days and mupirocin ointment. The culture from the lesion revealed a staph infection.

27.   Plaintiff returned to Dr. Sufka on 7/12/18. Dr. Sufka noted that Plaintiff continued to have problems with swelling in the hands despite a high dose of the medication hydroxycholoroquine. Dr. Sufka prescribed a low dose of ramadol for the pain. Dr. Sufka also began the process for pre-authorization for the medication Benlysta.

28.   At a 7/19/18 appointment, Ms. Haggland opined, "*Largely unchanged. New stress related [to] recent surgery and need to recover from this. Unable to work…Essentially stable but fragile…Hypervigilant, mood easily dysregulates*." Ms. Haggland prescribed zolpidem in addition to Plaintiff's other medications.

29.   On 8/13/18, Plaintiff returned to Dr. Sufka and reported significant pain and fatigue. Dr. Sufka told the Plaintiff that the biopsy showed superficial to deep dermal perivascular lymphocytic infiltrate with dense dermal scar. It was felt that the lymphocytic immunophenotyping appeared reactive. Plaintiff reported painful swelling in her hands and feet, confirmed

8

on exam. Plaintiff had contracted bronchitis and was using a steroid inhaler. Dr. Sufka prescribed hydrocodone for the pain and Benlysta to control the lesions. Dr. Sufka mentioned that it would take months for the full effect of Benlysta to be known.

30.     On 8/15/18, Plaintiff reported to Ms. Haggland that her mental health had improved, but she was recovering from pneumonia and switching from Adderall to Ritalin at her rheumatologist's direction. Ms. Haagland opined, "*Mood is stable at present. Concerns about starting new immune therapy as it can cause suicidal ideation. Will continue same medications and monitor symptoms closely*."

31.     On 8/23/18, Dr. Sufka wrote a letter opining that Plaintiff was unable to engage in any substantial gainful activity.

32.     On 9/4/18, Dr. Sufka wrote a letter requesting workplace accommodations for Plaintiff. He opined that Plaintiff should work at a new location, requested additional time off for her many medical appointments, a flexible work agreement so that Plaintiff could work from home when symptomatic, and a regular and predictable work schedule.

33.     On 9/26/18, Plaintiff returned to see Ms. Haagland. Ms. Haagland opined, "*Mood stabilized. May be in part due to restart of Adderall…*"

34.    Plaintiff saw Dr. Sufka on 9/28/18 and reported some improvement in her swelling, although her hands had some redness. Dr. Sufka continued the hydrocodone prescription and told Plaintiff to begin taking methotrexate again.

*Application for LTD Benefits*

35.    Plaintiff exhausted her Short-Term disability benefits on 10/15/18. Plaintiff applied to Standard for LTD.

36.    On 10/23/18, Plaintiff reported to Ms. Haagland that she was feeling good, but was still sleeping an average of 12 hours per night. Plaintiff reported that she would be interviewing for a job in Indiana. Ms. Haagland suggested adding another dose of stimulant in the evening. Ms. Haaglund also wrote a letter requesting accommodations for Plaintiff. Ms. Haagland identified Plaintiff's symptoms as fatigue, insomnia, depressed mood, loss of motivation, worry, difficulty managing change and excessive stress, inattention, distractedness, and forgetfulness. She opined that these symptoms were exacerbated by Plaintiff's physical ailments.

37.    Plaintiff underwent a procedure to remove her facial lesion on 10/31/18.

38.    When Plaintiff returned to Ms. Haagland's office on 11/19/18, she reported that she had had to stop all medications before having the surgery

to remove lupus lesions from her face, causing a flare in symptoms. Ms. Haggland opined that Plaintiff had high anxiety.

39.    Plaintiff returned to Dr. Sufka's office on 11/30/18 and reported that the Benylsta appeared to be helping. Dr. Sufka again re-filled hydrocodone for Plaintiff's pain.

*Denial of LTD Benefits*

40.    Plaintiff received a letter from Standard's Disability Benefits Analyst, Jordan Carey, on 12/18/18. The letter indicated that Standard's medical consultants had concluded that Plaintiff's mental health was stable as of 8/28/18 and Plaintiff's lupus was well-controlled as of 9/29/18. The letter stated that Plaintiff's LTD claim was approved for the closed period of 10/16/18-10/31/18. Standard's vocational consultant concluded that Plaintiff's job was "sedentary" level work.

*Appeal from LTD Benefits Denial*

41.    On 1/4/19, Plaintiff wrote to Mr. Carey and requested a review of her LTD claim denial. She objected that her job was not sedentary as she was obliged to give site tours and presentations. Plaintiff also explained that she was forced to stop taking Benlysta after her new medical insurance plan refused coverage and out-of-pocket cost would have been $48,000 annually. As a result, Plaintiff was forced to rely on methotrexate and narcotics. She

pointed out that her employer's corporate policy restricted her from working under the influence of narcotics. Mr. Carey referred Plaintiff to Benefits Review Specialist Roxanne Haworth regarding an appeal.

42.   On 1/17/19, Plaintiff returned to Dr. Sufka and reported that her symptoms had flared because she had had to stop taking Benlysta when her medical insurance changed and the new insurer would not approve the medication.  Her new medication regimen included Plaquenil, amlodipine, and hydrocodone. Dr. Sufka agreed to support Plaintiff's medical insurance appeal for Benlysta coverage.

43.   In a letter dated 1/18/19, Dr. Nelson observed that she had seen Plaintiff over 30 times in that nine-month period. Dr. Nelson described how Plaintiff had experienced many health crises that exacerbated her already strong depression. She noted, "*Although [Plaintiff] has lost her job, she has had to hire a housekeeper to help with house chores…[Plaintiff's] disease process contributes to her depression, anxiety, and PTSD. She does not know from day to day how she is going to feel. Overall, [Plaintiff's] health has declined since we first met in May 2018.*" Dr. Nelson also noted that Plaintiff no longer had access to the only medication, Benlysta, that provided any relief from her symptoms.

44.     At an appointment on 2/2/19, Plaintiff told Dr. Sufka that her medical insurance appeal had been approved and she could restart Benlysta. Dr. Sufka observed joint swelling in Plaintiff's hands and oral ulcerations. He observed periungual erythema over all her fingers, as well as peeling skin. Dr. Sufka observed Plaintiff's Raynaud's symptoms were worse and increased her dose of amlodipine.

45.     In need of income, Plaintiff attempted to work at a Club Pilates location during the month of March 2019.  Plaintiff's employment ended when her employer communicated that she was not able to work consistently or often enough due to her pain and medical appointments.

46.     On 4/9/19, Plaintiff was admitted to the Emergency Department of Regions Hospital for a constant lupus flare, chest pain, and severe joint pain. Plaintiff was given IV Medrol for the flare.

47.     Dr. Sufka wrote another letter of support on 4/9/19 opining that Plaintiff would not be able to return to work in the foreseeable future, if not indefinitely. Dr. Sufka identified Plaintiff's symptoms including joint pain with swelling and stiffness, fatigue, photosensitivity, skin ulcerations, oral ulcers, increased risk of infection due to immunosuppressive medications, and cyanosis of the fingers and toes. He noted that Plaintiff's condition flared because she did not have access to Benlysta for three months while she

appealed from her medical insurance company's denial of drug coverage. Dr. Sufka noted that Plaintiff had to send her child to full-time daycare despite not working because she was generally ill 3-4 days per week. He noted that Plaintiff was generally out of bed about 3-4 hours per day. Dr. Sufka observed that Benlysta heightens anxiety as a side effect, which exacerbated Plaintiff's mental health symptoms. He also opined, "*Plaintiff is in therapy but has not been able to show concentration to complete a task*." He went on to observe, "*[Plaintiff] did attempt to return to part time, light duty work, however was let go from the position within 1 month due to inconsistent availability and disease limitations they could not accommodate*."

48.    At a visit on 4/15/19, Dr. Sufka observed that Plaintiff was now doing a trial of methotrexate. Plaintiff showed Dr. Surka multiple photos of swelling with erythema in her hands, knees, and feet. Plaintiff reported having gastrointestinal upset as well as recurrent migraines. Plaintiff was referred for Botox treatment for her migraines.

49.    Plaintiff again presented to the Regions Emergency Department on 4/17/19, with pain and swelling of the neck. Plaintiff had a new lesion with erythema and underlying pus on the posterior of her neck. Plaintiff was treated with IV pain medications.

50.     Plaintiff supplied materials to Standard's Ms. Haworth to support her LTD benefits appeal, including photographs of her lesions and hospital stays, letters to Cargill requesting accommodations, a letter of support from Dr. Nelson dated 1/18/19, and letters from Dr. Sufka dated 8/23/18 and 4/9/19.

51.     Plaintiff and Cargill negotiated an agreement signed on 5/3/19 that terminated her employment at Cargill as of 10/18/18.

<em>Denial of LTD Benefits on Appeal</em>

52.     Ms. Haworth wrote to Plaintiff on 5/3/19 informing her that the denial of benefits decision would be upheld. The letter stated, "*The Physician Consultant explained that he was not able to find anything in your records to suggest a more severe or aggressive disease or anything that would render you unable to engage in any work activity*." It also stated, "*[The Physician Consultant] explained that by the end of October 2018, you had shown significant improvement and had stable mental status*." The letter stated benefits would be paid through 10/31/18.

<em>Plaintiff's Medical Condition Continues and Her Diagnosis Evolves</em>

53.     On 5/7/19, Plaintiff again followed up with Dr. Sufka and reported that an EGD (esophagogastroduodenoscopy) had revelaed a single nonbleeding cratered ulcer. The ulcer was biopsied, indicating ulcerative reactive gastropathy. Although Dr. Sufka has earlier suggested starting the

drug leflunomide, a decision was made to wait because Plaintiff was considering surgical removal of part of her stomach due to the ongoing ulceration. Plaintiff also had significant joint pain and swelling in the hands, knees, and feet, as well as fatigue. Dr. Sufka encouraged Plaintiff to get a formal gastroenterology consultation. He opined that Plaintiff's case was difficult and that she might benefit from a second opinion from the University of Minnesota physicians.

54.    Plaintiff was no better upon her return to Dr. Sufka on 6/11/19. Dr. Sufka suggested trying omeprazole and sucralfate for her gastric symptoms. Dr. Sufka terminated the Benlysta and suggested trying etanercept. Plaintiff returned to see him on 6/19/19 due to side effects from the omeprazole including headache, vomiting, and slurred speech. Plaintiff was given IV fluids and told to stop taking omeprazole.

55.    On 7/16/19, Plaintiff consulted with a neurologist about her migraines and was treated with Toradol and scheduled to receive Botox.

56.    On 7/23/19, Plaintiff reported to Dr. Sufka that her flares were reduced with the medication etanercept, but she was still significantly fatigued.

57.    Plaintiff consulted gastroenterologist, Hashim Nemat, MD, on 8/21/19. Although Plaintiff's ulcer had resolved, Plaintiff was still

16

experiencing some gastric symptoms. Dr. Nemat advised Plaintiff to stop taking prednisone.

58.     By the time Plaintiff returned to Dr. Sufka on 8/26/19, he considered that she might have lupus *and* rheumatoid arthritis. He suggested resuming hydroxychloroquine and trying gabapentin. Plaintiff reported taking Fioricet and oxycodone for her migraines.  Dr. Sufka noted that Plaintiff's gastroenterology work up was in progress.

59.     On 10/15/19, Plaintiff returned to Dr. Sufka and told him that Dr. Parastoo Fazeli, MD, at the University of Minnesota had diagnosed her condition as Vascular Ehlers Danlos Syndrome ("vascular EDS").   This diagnosis was consistent with hypermobility, abnormal skin healing, lesions, and gastric ulcerations. Dr. Sufka recommended the Ehlers Danlos clinic at Mayo.

60.     The National Institutes of Health defines vascular EDS as a rare inherited connective tissue disorder that is caused by defects in a protein called collagen. It is generally considered the most severe form of Ehlers-Danlos syndrome. Common symptoms include thin, translucent skin; easy bruising; characteristic facial appearance; and fragile arteries, muscles, and internal

organs.[1]  Vascular EDS is caused by a mutation in the COL3A1 gene or the

COL1A1 gene.[2]  People with vascular EDS have tissue fragility that puts them

at high risk for rupturing of arteries, muscles, and internal organs.[3]  The

median lifespan for a person with vascular EDS is 51 years.[4]

61.    Plaintiff underwent another EDG on 10/31/19 which showed

nonbleeding gastric and duodenal ulcers.

62.    Plaintiff was unable to control her pain with nonsteroid anti-

inflammatories or steroids due to her ulcers. On 11/5/19, Plaintiff was

admitted to Regions Hospital Emergency Department for pain and inability to

tolerate taking in food or water. Plaintiff was treated with IV fluid and

Dilaudid.

63.    Dr. Sufka referred Plaintiff for a palliative care consultation

which occurred on 12/6/19. Plaintiff continues to receive palliative care

management.

---

[1]    https://rarediseases.info.nih.gov/diseases/2082/vascular-ehlers-danlos-syndrome (last accessed 3/2/22).

[2] *Id.*

[3] *Id.*

[4]    https://www.ehlers-danlos.com/vascular-ehlers-danlos-syndrome/    (last accessed 3/2/22).

64.    Plaintiff underwent a consultation at the Mayo Clinic on 12/11/19. Plaintiff reported to Dr. Sufka that Mayo concurred in her vascular EDS diagnosis.

65.    Plaintiff returned to Regions Hospital on 1/22/20 for crisis evaluation. Plaintiff was experiencing increased depression and anxiety symptoms related to her new diagnosis of vascular EDS and beginning palliative care.

66.    On 1/27/20, Plaintiff was admitted to DayBridge Partial Hospitalization Program at Regions Hospital. Plaintiff was diagnosed with moderate depressive disorder, generalized anxiety disorder, and post-traumatic stress disorder. Plaintiff was discharged from the program on 2/17/20.

67.    Plaintiff followed up with Dr. Sufka on 3/10/20 and 5/15/20 with little change in her symptoms. However, in the following months, Plaintiff's gastric symptoms flared when she stopped taking etanercept and prednisone in preparation for a vagotomy (procedure to surgically remove a part or the whole of the portion of the vagus nerve that controls the digestive system) and antrectomy (surgical removal of a part of the stomach known as the antrum) to treat her intractable nausea and vomiting. Plaintiff underwent that procedure on 8/11/20.

68.     Plaintiff followed up with Dr. Sufka on 12/15/20, 3/11/21, and 4/28/21, reporting improvements in her gastric health, but worsened swelling in her hands due to holding medications for surgery and a new diagnosis of adrenal insufficiency.

69.     Plaintiff's relief from gastric symptoms did not last and she presented to the Emergency Department with nausea and inability to drink on 4/30/21. Plaintiff was given IV fluids and Ceftriaxone.

### *Request to Reassess LTD Benefits Claim*

70.     Plaintiff contacted Ms. Haworth at Standard about re-assessing her LTD claim in May 2021. Plaintiff was referred to Debbie Angleton, a "manager" at Standard, regarding another potential review of the claim. Plaintiff sent Ms. Angelton updated medical records that explained her revised diagnosis of vascular EDS on 5/20/21 and requested that her claim be reconsidered. Ms. Angleton suggested a phone conference and Plaintiff retained the undersigned to represent her.

71.     On the 6/7/21 phone call, Ms. Angleton confirmed receipt of Plaintiff's submissions. Ms. Angleton opined that the claim was handled appropriately and that no further action would be taken by Standard.

72.     As a result of her continuing medical issues Plaintiff has been unable to work at her own occupation or any occupation since 4/18/18.

73.    Plaintiff has exhausted her administrative remedies under the LTD Plan and the Policy.

74.    Plaintiff now brings this suit seeking reinstatement into active LTD claim status, payment of the claim going forward, and retroactive benefits extending back to 11/1/18.

## COUNT I–CLAIM FOR RELIEF UNDER ERISA, 29 U.S.C. §1132(a)(1)(B)

75.    Plaintiff incorporates all preceding allegations in this Complaint and further alleges as follows.

76.    Standard's denial of LTD benefit payments to Plaintiff is in breach of the LTD plan and Policy and violates ERISA 29 U.S.C. § 1132(a)(1)(B).

**WHEREFORE**, Plaintiff demands judgment against Standard ordering the following:

(i)    Plaintiff is entitled to coverage and meets the definition of disability under the LTD plan;

(ii)    Plaintiff is owed all past due LTD benefits plus interest from the Defendant;

(iii)    Defendant must commence the payment of monthly LTD benefit payments going forward from the date of judgment according to the terms of the LTD plan;

(iv)     Defendant must reimburse Plaintiff's costs, disbursements, and other expenses of this litigation, including reasonable attorneys' fees and experts' fees, pursuant to 29 U.S.C. §1132(g); and

(v)      Provide such other and further relief as the Court deems just and proper.

Dated: **March 2, 2022**          **Respectfully submitted:**

By: s/ Nicolet Y. Lyon
Nicolet Y. Lyon (#0391954)
Katherine L. MacKinnon (#170926)
LAW OFFICE OF KATHERINE L. MACKINNON, P.L.L.C.
2356 University Ave W. Ste. 230
(952) 915-9215 (ph)
(952) 915-9217 (fax)
nicolet@katemackinnon.com
kate@katemackinnon.com
***Counsel for Plaintiff Katherine Sundgren***